**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **PROFESSIONAL CLEANING AND INNOVATIVE BUILDING SERVICES, INC.,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**KENNEDY FUNDING, INC., GREGG WOLFER, JEFFREY WOLFER, JOSEPH WOLFER, and KEVIN WOLFER,**<br><br>    **Defendants.** | 2:05-CV-2384 (WJM)<br><br><br><br>**OPINION**<br><br>**HON. WILLIAM J. MARTINI** |

**MARTINI, U.S.D.J.**

This matter comes before the Court on cross-motions for summary judgment arising out of claims stemming from a commercial real estate financing transaction.  The Court did not hold oral argument.  Fed. R. Civ. P. 78.  For the following reasons, the Defendants Kennedy Funding Inc. ("Kennedy"), Gregg Wolfer, Jeffrey Wolfer, Joseph Wolfer, and Kevin Wolfer's motion for summary judgment is **GRANTED** with regards to Counts One, Two, Three, and Six.  Defendants' motion or summary judgment is **GRANTED** with regards to Gregg Wolfer and **DENIED** with regards to Kennedy for purposes of Counts Four and Five.  Plaintiff Professional Cleaning and Innovative Building Services, Inc.'s ("Professional") cross-motion for summary judgment is **DENIED** in its entirety.  In addition, the Court will *sua sponte* **DISMISS** the present action for lack of subject matter jurisdiction.

# BACKGROUND

This is one of many actions within this district involving Kennedy and its lending practices.[1]  Kennedy is a New Jersey based lender of last resort–a "hard money lender"–that provides financing to companies with time-sensitive needs.  (Aff. of Gregg Wolfer (hereinafter "Wolfer Aff.") Ex. A.)  Professional is a Missouri based corporation that engages in the purchasing, leasing, and maintenance of commercial property. (Second Amend. Compl. ¶ 5.)

In February 2004, Professional contacted Kennedy, through a broker, seeking to obtain a loan of $1,800,000 to purchase commercial property in Bonner Springs, Kansas. (*Id.* at ¶¶ 19-24.)  Kennedy sent Professional a letter of interest on March 4, 2004. (Wolfer Aff. Ex. B.)  The letter indicated that Kennedy would make a five-year loan to Professional for up to 60% of the "as is" market value of the real estate collateral that would secure the loan, defining "as is" market value as a "three (3) to four (4) month sale to a cash buyer."  (*Id.*)  Kennedy agreed to charge Professional a flat rate of 12% for the first year and 18% per year thereafter.  (*Id.*)  The letter also demanded a $10,000 fee in order for Professional to receive a draft of a loan commitment, which was "fully

---

[1] Several courts within this district have issued opinions in related matters.  *See Construcciones Haus Soceidad v. Kennedy Funding Inc.*, Civ. No. 07-0392, 2008 WL 1882857 (D.N.J. Apr. 24, 2008); *Royale Luau Resort, LLC v. Kennedy Funding, Inc.*, Civ. No. 07-1342, 2008 WL 482327 (D.N.J. Feb. 19, 2008); *Kennedy Funding, Inc. v. Ruggers Acquisition and Dev.*, Civ. No. 07-669, 2007 WL 2212859 (D.N.J. July 31, 2007); *Kennedy Funding, Inc. v. Lion's Gate Dev., LLC*, Civ. No. 05-4741, 2006 WL 2786927 (D.N.J. Sept. 26, 2006); *Kennedy Funding, Inc. v. Lion's Gate Dev., LLC*, Civ. No. 05-4741, 2006 WL 2038496 (D.N.J. July 19, 2006).

refundable for any reason if you do not execute a loan commitment with [Kennedy]."
(*Id.*)

Professional paid the $10,000 fee and received a draft of the loan commitment on March 11, 2004.  (*Id.* at Ex. C.)  In addition to restating the above definition of "as is" market value, the draft articulated that Kennedy would select an appraiser of its choice to determine the value of the collateral property.  (*Id.*)  Following the initial valuation, Professional had the option to obtain a third-party appraisal, at its own expense, from a mutually agreed upon party.  (*Id.*)  Execution of the draft was contingent upon receipt of a $54,000 non-refundable fee.  (*Id.*)

Professional CEO, Brenda Wood, called Kennedy CEO, Gregg Wolfer, on April 9, 2004.  (Affirmation of Jill Anne Lazare (hereinafter "Lazare Affirmation") Ex. OO tab 2.)  As stated at Wood's deposition, during the course of this conversation, Professional alleges that Gregg Wolfer assured Wood that Professional would receive the needed financing if the property value was appraised in excess of $3,100,000.  (Lazare Affirmation Ex. II.)

On April 12, 2004, Professional sent Kennedy a letter seeking further clarification of the loan commitment terms.  (Wolfer Aff. Ex. D.)  The letter primarily focused on two issues: (1) Professional's obligation to pay Kennedy's legal fees and expenses; and (2) whether or not the initial $10,000 fee was refundable.  (*Id.*)  The letter did not address the definition of "as is" market value.

3

The parties executed the loan commitment on April 14, 2004 and Professional paid Kennedy a non-refundable $54,000 fee.  (Wolfer Aff. Ex. E.)  Kennedy then selected Volpe, Inc. ("Volpe") to perform the initial appraisal.  (*Id.* at Ex. F.)  Volpe determined that the property in question had a value of $2,610,000 and an "as is" market value of 20% less, or $2,088,000.  (*Id.*; Lazare Affirmation Ex. OO tab 4.)  Based on this appraisal, Kennedy offered Professional a loan of $1,253,000, or approximately 60% of $2,088,000.  (Wolfer Aff. Ex. F.)

Upon receipt of the loan offer, Professional requested a third-party appraisal and sent Kennedy a copy of a phone book for "use as a reference for some companies . . . in the local area."  (*Id.* at Ex. G.)  On May 13, 2004, Kennedy selected Adamson & Associates, Inc. ("Adamson & Associates") for the appraisal, at a cost of $2,000.  (*Id.* at I.)  After Kennedy notified Professional of its selection, Professional forwarded this amount to Kennedy.  Adamson & Associates determined that the property in question had a value of $3,040,000 and an "as is" market value of $2,430,000.  (*Id.* at K.)  Kennedy offered Professional a second loan of $1,458,000, or approximately 60% of $2,430,000.  (*Id.* at L.)  Despite two extensions, Professional refused to accept this offer.  (*Id.* at Exs. M, N.)

On May 5, 2005, Professional initiated the present action.  The original complaint asserted claims for violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. §§ 56:8-1 *et seq.*, unconscionability, breach of good faith and fair dealing, and breach of

contract.  On August 11, 2005, the Court granted Kennedy's motion to dismiss, finding

that it lacked subject matter jurisdiction.  Thereafter, Professional attempted to file an

amended complaint, seeking to add claims for common law fraud and unjust enrichment.

Magistrate Judge Ronald Hedges denied this request initially and upon reconsideration

and this Court affirmed.  On appeal, the Third Circuit reversed, stating that "the District

Court erred in reasoning that the proposed amended complaint failed to sufficiently plead

a claim for common-law fraud and a claim under the [CFA], providing the possibility for

punitive or treble damages."  *Professional Cleaning & Innovative Bldg. Servs. Inc., v.*

*Kennedy Funding Inc.*, 245 Fed. Appx. 161, 162-63 (3d Cir. 2007).  The matter was

remanded.

Professional filed a first and second amended complaint on August 27, 2007 and

April 29, 2008 respectively.  The Second Amended Complaint added Gregg Wolfer,

Jeffrey Wolfer, Joseph Wolfer, and Kevin Wolfer as defendants and sought relief under

the CFA, the New Jersey Racketeer Influenced and Corrupt Organizations Act ("RICO"),

N.J.S.A. §§ 2C:41-1 *et seq.*, as well as common law claims for unconscionability, breach

of contract, fraud, and unjust enrichment.  Defendants filed a motion for summary

judgment on November 6, 2008 and Professional cross-motioned for summary judgment

on December 19, 2008.

## STANDARD OF REVIEW

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A court should grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party makes a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

The summary judgment standard does not change when, as here, the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment. *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be

entered in favor of the party deserving of judgment in light of the law and undisputed

facts. *See Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

## DISCUSSION

**A.    Consumer Fraud Act**

In Count One, Professional brings a claim under the CFA against Kennedy and

Gregg Wolfer individually.  (Second Amend. Compl. ¶¶ 56-67.)  The CFA protects

consumers from deception and fraud in the sale or advertisement of merchandise.  *Turf*

*Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 414 (N.J. 1995).  The

CFA makes it unlawful for "any person"[2] to use an "unconscionable commercial practice,

deception, fraud, false pretense, false promise, misrepresentation, or the knowing

concealment, suppression, or omission of any material fact . . . in connection with the sale

or advertisement of any merchandise or real estate."  N.J.S.A. § 56:8-2.  To state a claim

under the Act, a plaintiff must allege three elements: (1) unlawful conduct by the

defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal

relationship between the defendants' unlawful conduct and the plaintiff's ascertainable

loss.  *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (N.J. Super.

Ct. App. Div. 2003).

---

[2]  Under the CFA, the term "person" includes any "partnership, corporation, company, trust, business entity or association . . ."  N.J.S.A. § 56:8-1.  Under the Act, Kennedy qualifies as a "person."

7

The crux of Professional's CFA claim is that Kennedy and its CEO Gregg Wolfer engaged in the following unlawful conduct.  First, Kennedy and Gregg Wolfer knowingly concealed, suppressed, or omitted and/or conspired to conceal, suppress, or omit the equation for "as is" market value by nebulously defining the term as a "three (3) to four (4) month sale to a cash buyer."  Plaintiff contends that this definition did not explicitly indicate that the collateral property's appraised value would be discounted by 20%, thereby inducing Professional into executing the loan commitment and paying a non-refundable $54,000 loan commitment fee.  (Second Amend. Compl. ¶¶ 58-63.)  In support of this argument, Professional presents evidence of a February 16, 2001 transaction involving Kennedy, where the same appraiser used here, Volpe, applied a 20% and 30% discount to derive the "'as is' quick sale value" of the collateral property, defined as a 90-to-120 day sale to a cash buyer.[3]  (Lazare Affirmation Exs. X, Y & Z.)

Second, Professional alleges that Gregg Wolfer made a material misrepresentation to its CEO Brenda Wood prior to the execution of the loan commitment in the form of an oral assurance.  Wood asserts that during a telephone conversation on April 9, 2004

---

[3]  Professional also presents evidence of other subsequent transactions involving Kennedy where the appraised market value was discounted to derive an "as is" market value or a similarly defined "quick sale value."  (Lazare Affirmation Exs. C-W, AA-EE.)  Under New Jersey law, in order to constitute a fact susceptible to misrepresentation or fraud, the statement's contents must be susceptible to "exact knowledge" at the time it was made.  *See Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (N.J. Super. Ct. App. Div. 1978).  Since Kennedy did not have "exact knowledge" of these subsequent transactions when it executed the loan commitment with Professional, these transactions will not be considered for purposes of the CFA or claim for common law fraud discussed *infra*.

Gregg Wolfer stated that if the property met the "appraised value"[4] of between

$3,100,000 and $3,200,000 "that there should be no problem getting this deal through."

(Lazare Affirmation Ex. II.)  Since Kennedy knew that Professional needed $1,800,000

in financing and according to Wood believed the property in question to be worth

between $3,000,000 and $3,200,000, Kennedy's alleged assurance indicated that the

collateral's appraised value would not be discounted by 20%.  (Wolfer Aff. Ex. E; Lazare

Affirmation Exs. II, OO tab 3.)  Professional relied on this statement when entering into

the loan commitment, suffering an ascertainable loss in the form of a non-refundable

$54,000 loan commitment fee and $6,000 in appraisal fees.  (Second Amend. Compl. ¶

67.)

Even in light of the foregoing, Professional cannot maintain a claim under the

CFA against Kennedy or Gregg Wolfer individually.  The CFA does not cover every sale

in the marketplace.  *Papergraphics Intern., Inc. v. Correa*, 389 N.J. Super. 8, 13 (N.J.

Super. Ct. App. Div. 2006).  The statute's applicability hinges on the nature of a

transaction, requiring a case by case analysis.  *Id.*  The CFA only applies "to consumer

transactions which are defined both by the status of the parties and the nature of the

transaction itself."  *Hoffman v. Encore Capital Group, Inc.*, 2008 WL 5245306, at *3

---

[4]  The Court notes that, even as alleged by Professional, Gregg Wolfer did not definitively
state "appraised market value" during the April 9, 2004 telephone conversation.  Instead, he stated
"appraised value."  As will be discussed more fully with regards to the common law fraud claim, the
phrase "appraised value" can be reasonably construed to mean "as is" market value based on the
explicit terms of the loan commitment and associated documents.

(N.J. Super. Ct. App. Div. Dec. 18, 2008) (citation omitted).  Courts addressing whether a given transaction qualifies as a "consumer transaction" often examine whether the challenged service qualifies as "merchandise"[5] which is"of the type sold to the general public."  *Finderne Mgmt. Co., Inc. v. Barrett*, 402 N.J. Super. 546, 570 (N.J. Super. Ct. App. Div. 2008) (collecting cases); *see also Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 514 (3d Cir. 2006); *S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370, 399 (D.N.J. 2007); *Salamon v. Teleplus Enters., Inc.*, Civ. No. 05-2058, 2008 WL 2277094, at *11-12 (D.N.J. Jun. 2, 2008).  In addition, courts focus on the nature of the transaction, such as evidence relating to the experience of the commercial entities and evidence of equal bargaining power.  *See Papergraphics*, 389 N.J. Super. at 14; *accord 539 Absecon Blvd., L.L.C. v. Shan Enters. Ltd. P'ship*, 406 N.J. Super. 242, 276 (N.J. Super. Ct. App. Div. 2009).

Turning to the facts at hand, the record amply demonstrates that Professional and Kennedy are experienced commercial entities with relatively equal bargaining power.  The parties negotiated the terms of the loan commitment prior to its execution.  In an April 12, 2004 letter from Professional CEO Brenda Wood to Gregg Wolfer, Wood sought to "meet[] in the middle" with regards to Professional's obligation to pay legal fees and costs under the loan commitment.  (Wolfer Aff. Ex. D.)  Wood also questioned

---

[5]  The CFA defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  N.J.S.A. § 56: 8-1(c).  The definition of "merchandise" has been found to be broad enough to include the "sale of credit." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 265 (N.J. 1997).

whether the $10,000 fee, discussed in the letter of intent, would be refundable.  (*Id.*)

Wood acknowledged that Professional was not a first-time buyer of real estate and

mentioned that the entity recently purchased a real estate company.  (*Id.*)

Moreover, the hard money financing offered to Professional is not "merchandise"

which is "of the type sold to the general public."  As repeatedly stated by New Jersey

courts, the thrust of the CFA "is pointed to products and services sold to consumers in the

popular sense."  *Finderne Mgmt.*, 402 N.J. Super. at 570 (quoting *Arc Networks, Inc. v.

Gold Phone Card Co.,* 333 N.J. Super. 587, 589 (N.J. Super. Ct. Law Div. 2000)).

Unlike the sale of credit to the general public, Kennedy specializes in "unconventional

financing where speed and attention to special circumstances are critical."  (Wolfer Aff.

Ex. A.)  As evidenced by Kennedy's website, the company markets itself not as a

standard commercial lender, but as "America's leading commercial hard money lender"

that provides "creative funding solutions."  (*Id.*)  This type of funding does not qualify as

the sale of credit in the "popular sense."

In total, Professional is not an unsophisticated buyer, suffering a disparity of

industry knowledge, victimized after being lured into this purchase through fraudulent,

deceptive selling or advertising practices.  *See D'Ercole Sales, Inc. v. Fruehauf Corp.*,

206 N.J. Super. 11, 23-24 (N.J. Super. Ct. App. Div. 1985).  To the contrary, Professional

is an experienced commercial entity that negotiated to obtain "creative financing" from

Kennedy after being introduced by its paid broker.  (Second Amend. Compl. ¶¶ 20-23; Wolfer Aff. Ex. A.)

For similar reasons, Professional cannot maintain a claim against Gregg Wolfer individually.  Several New Jersey courts have imposed individual liability based on the CFA's definition of "person."  *See, e.g.*, *Cardillo v. Bolger*, 2009 WL 62866 (N.J. Super. Ct. App. Div. Jan. 12, 2009); *New Mea Const. Corp. v. Harper*, 203 N.J. Super. 486 (N.J. Super. Ct. App. Div. 1985); *Hyland v. Aquarian Age 2,000 Inc.*, 148 N.J. Super. 186, 193 (N.J. Ch. Div. 1977).  The CFA defines "person" to include "any natural person . . . [or] corporation . . . and any . . . officer . . . [or] stockholder . . . thereof . . . ."  N.J.S.A § 56:8-1.  Even if Gregg Wolfer personally engaged in the alleged conduct, as stated above, the "merchandise" offered by Kennedy is not offered to the public in the popular sense, making the CFA inapplicable.

Even assuming that Professional's claim constituted a "consumer transaction" under the CFA, the Court notes that Gregg Wolfer could not be found liable under the "tort participation theory."  In limited situations, New Jersey courts have imposed individual liability under the CFA for actions involving intentional torts and negligence under the "tort participation theory."  *Saltiel v. GSI Consultants,* Inc., 170 N.J. 297, 305 (N.J. 2002) (citing Kugler *v. Koscot Interplanetary, Inc.*, 120 N.J. Super. 216, 253-56 (N.J. Ch. 1972)); *but see Cardillo*, 2009 WL 62866 at *5 (questioning whether the tort-participation theory should limit the reach of the CFA).  However, liability under this

12

theory requires that underlying action sounds in tort as opposed to contract.  *Saltiel*, 170

N.J. at 308-09.  A tort remedy does not arise from a contractual relationship unless the

breaching party owed an independent duty imposed by law.  *Id.* at 314 (citing *Int'l*

*Minerals & Mining Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587, 597 (D.N.J. 1990)).

Here, the loan commitment defined the scope of the parties' obligations and Professional

does not present any evidence that Gregg Wolfer owed it an independent duty.  As such,

the action sounds in contract as opposed to tort, rendering the "tort participation theory"

inapplicable.

Accordingly, Professional's CFA claim against Kennedy and Gregg Wolfer must

be dismissed.  Defendants' motion for summary judgment is **GRANTED** and

Professional's motion for summary judgment is **DENIED** with regards to Count One.

**B.      New Jersey RICO**

Relying in part on the same conduct described above, Professional brings a civil

New Jersey RICO claim in Count Six against Gregg Wolfer, Kevin Wolfer, Jeffrey

Wolfer, and Joseph Wolfer (collectively the "Wolfer Defendants").  Professional alleges

that Kennedy constitutes an enterprise though which the Wolfer Defendants effectuated

racketeering activities, as defined under the statute.  (Second Amend. Compl. ¶¶ 89-123.)

The New Jersey RICO statute provides that "[a]ny person damaged in his business

or property by reason of a violation of [N.J.S.A.] § 2C:41-2 may sue therefor in any

appropriate court and shall recover threefold any damages he sustains and the cost of the

suit . . . ."  N.J.S.A. § 2C:41-4(c).  One of the elements of a New Jersey RICO claim is

that the defendants engaged in "a pattern of racketeering activity" consisting of predicate

acts.  N.J.S.A. § 2C:41-2(a); *see also State v. Ball*, 141 N.J. 142, 161-62 (N.J. 1995).  A

pattern of racketeering is defined in pertinent part as "[e]ngaging in at least two incidents

of racketeering conduct . . .; and [a] showing that the incidents of racketeering activity

embrace criminal conduct that has either the same or similar purposes, results,

participants or victims or methods of commission or are otherwise interrelated by

distinguishing characteristics and are not isolated incidents."  N.J.S.A. § 2C:41-1(d).  The

Act defines "racketeering activity" as any one of the criminal offenses enumerated in

N.J.S.A. 2C:41-1a(1), including "forgery and fraudulent practices and all crimes defined

in chapter 21 of Title 2C of the New Jersey Statutes"  N.J.S.A. § 2C:41-1(a)(o).  In

Professional's pleadings, it asserts that the Wolfer Defendants engaged in racketeering

activity under N.J.S.A. §§ 2C:21-4(a) and 2C:21-7(h).

Section 2C:21-4(a) declares that "a person commits a crime of the fourth degree if

he falsifies, destroys, removes, conceals any writing or record, or utters any writing or

record knowing that it contains a false statement or information with purposes to deceive

or injure anyone or to conceal any wrongdoing."  N.J.S.A. § 2C:21-4(a).  Similarly, §

2C:21-7(h) prohibits the use of a "false or misleading written statement for the purpose of

obtaining property or credit."  N.J.S.A. § 2C:21-7(h).  The Supreme Court of New Jersey,

in the criminal RICO context, has defined "statement" as either "a report or narrative" or

14

"a single declaration or remark." *State v. Fleischman*, 189 N.J. 539, 546 (N.J. 2007).

Moreover, Black's Law Dictionary defines "false" simply as "untrue." *Black's Law*

*Dictionary* 618 (7th ed. 1999).

In the loan commitment, and several other documents, Kennedy defines "as is"

market value as a "three (3) to four (4) month sale to a cash buyer." (Wolfer Aff. Ex. E.)

Kennedy disclosed this definition in the letter of interest, the draft of the loan

commitment, and the final loan commitment executed by the parties. (*Id.* at Ex. B-C, E.)

Professional points to this definition as evidence of a "false statement" for purposes of §

2C:21-4(a) and a "false or misleading written statement" for purposes of § 2C:21-7(h).

Professional maintains that the Wolfer Defendants engaged in "deceptive trade practices"

by using ambiguous language. (Second Amend. Compl. ¶¶ 92-98.) This ambiguous

definition lured Professional and other borrowers into executing loan commitments and

forwarding non-refundable loan commitment fees. The Wolfer Defendants conspired to

commit this alleged racketeering activity, as evidenced by the fact that Kennedy closed

on less than 20% of the loans for which it received such fees. (*Id.*; Wolfer Aff. Exs. C-

EE.)

The question thus presented to the Court is whether the Wolfer Defendants

through Kennedy defined "as is" market value so ambiguously in the loan commitment

that it constitutes a "false" or "false or misleading" statement for purposes of New

Jersey's RICO statute. Whether a contract term is clear or ambiguous is a question of

15

law. *Nester v. O'Donnell*, 301 N.J. Super. 198, 210 (N.J. Super. Ct. App. Div. 1997). An

ambiguity in a contract exists if the terms of the contract are susceptible to at least two

reasonable alternative interpretations. *Id.* Terms of contract must be given their plain

and ordinary meaning. *Id.*

As stated in the loan commitment, the definition of "as is" market value is not

ambiguous. A plain reading of the definition indicates that Kennedy would discount the

collateral property's market value by some amount to derive the "as is" market value for

purposes of determining its loan offer. Specifically, the phrase "cash buyer" signals a

narrower field of potential purchasers and the phrase "three (3) to (4) four month sale"

suggests a short marketing period. Combined, a short marketing period to a narrower

field of potential purchasers implies a discounted valuation for the collateral property.

Since Kennedy indicated to Professional that the appraised collateral value would be

discounted, the definition of "as is" market value cannot be construed as "false" or even

"misleading" for purposes of the New Jersey RICO statute.

Moreover, Kennedy's failure to include the exact percentage of the discount does

not render this definition ambiguous. The agreement expressly provided for the use of a

third party appraiser to calculate the "as is" market value, implying that the appraiser

would determine the extent of the discount and not Kennedy. As stated in the loan

commitment, after receiving a "determination of value by the third party appraiser,"

Kennedy agreed to offer a loan of 60% of the "as is" market value "as determined by said

16

appraiser." (Wolfer Aff. Ex. E.)  The loan commitment granted Professional the election to "engage the services of a third party appraiser" if Kennedy's "determination of the value of the property is disputed by Borrower." (*Id.*)  For the second appraisal, Kennedy and Professional assented to "mutually agree on a third party MAI appraiser, with proper credentials, contracted by [Kennedy]." (*Id.*)

Pursuant to the agreement, the parties utilized two independent appraisers, Volpe and Adamson & Associates.  Through the use of these appraisers, the parties implicitly agreed to rely on the appraisers' professional judgment to determine the appropriate discount to a standard market value based on a three-to-four month sale to an all cash buyer.  Using their expertise, the appraisers both separately discounted the market value of the collateral property by roughly the same amount, 20%.  The initial appraiser, Volpe, applied this discount because of the availability of other commercial real estate in the property's vicinity.  (Lazare Affirmation Ex. OO tab 4.)  The mutually agreed appraiser, Adamson & Associates, discounted the "typical" market value by this amount based on "standard assumptions" and various limiting conditions.  (Wolfer Aff. Ex. K.)

There is nothing in the record to indicate that Kennedy exercised its own discretion to calculate the "as is" market value and Professional does not present any evidence that Kennedy colluded with Volpe or Adamson & Associates to artificially lower the value of the property in question.  Since the parties explicitly agreed to use a appraiser to determine the "as is" market value, it was not false or misleading for

Kennedy to omit a fixed percentage of discount.  Clearly, the level of the discount was up to the judgment of appraiser, pursuant to the appraisal process outlined in the loan commitment.

The Court's interpretation is further supported by the parties' course of dealing. Courts may consider "custom, usage, and the interpretation placed on the disputed provision by the parties' conduct" when resolving an ambiguous term in a contract. *Kearny PBA Local No. 21 v. Town of Kearny*, 81 N.J. 208, 221 (N.J. 1979).  Such evidence establishes "'a common basis of understanding for interpreting their expressions and other conduct,'" *Winslow v. Corporate Express, Inc.*, 364 N.J. Super. 128, 133 (N.J. Super. Ct. App. Div. 2003) (citing Restatement (Second) Contracts § 223(1) (1981)), and may be used prior to determining whether the contract is ambiguous, Restatement (Second) Contracts § 223(2) cmt. b.

Here, the course of dealing indicates a lack of ambiguity with regards to the definition of "as is" market value.  Professional never questioned the definition either before or after the execution of the agreement.  Kennedy first disclosed the definition in the letter of intent and the draft of the loan commitment.  (Wolfer Aff. Exs. B-C). Following receipt of the draft, Professional attempted to negotiate the terms of the agreement, as evidenced by an April 12, 2004 letter.  (*Id.* at Ex. D.)  Specifically, Professional inquired into whether the initial $10,000 fee was refundable and attempted to avoid payment of Kennedy's legal fees for the transaction.  (*Id.*)  Although

18

Professional raised issues regarding other provisions in the proposed loan commitment, the letter contains no reference to the definition of "as is" market value.

Professional also did not address the definition of "as is" market value during the April 9, 2004 telephone conversation between Gregg Wolfer and Professional CEO Brenda Wood.  A close examination of the deposition testimony of Brenda Wood describing this conversation indicates that Gregg Wolfer, at most, promised to lend Professional $1,800,000 if the "appraised value" exceeded $3,100,000.  (Lazare Affirmation Ex. II.)  The testimony does not elaborate as to what Wolfer meant by "appraised value" and the conversation, as a whole, cannot be construed to represent a general inquiry into the definition's meaning.  (*Id.*)

Even after the parties executed the loan commitment, Professional still did not question the meaning of "as is" market value.  In conjunction with the first loan offer, Kennedy attached a report prepared by the first appraiser Volpe.  (Wolfer Aff. Ex. F.) This report listed two market values for the collateral property–an appraised value of $2,610,000 and an "as is" market value of $2,088,000.  (Lazare Affirmation Ex. OO tab 4.)  Following receipt of Volpe's report, Professional did not question Kennedy about the definition and did not inquire as to why Volpe calculated two values.  Instead, Professional followed the procedure outlined in the loan commitment and exercised its right to obtain a second appraisal from a mutually agreed upon third party.  (Wolfer Aff. Ex. G.)

Furthermore, even if Kennedy ambiguously defined "as is" market value, the Court notes that Kennedy's behavior does not qualify as "the type of significant societal threat that RICO was designed to deter or penalize." *Tabas v. Tabas*, 47 F.3d 1280, 1309 (3d Cir. 1995).  In *Tabas*, the Third Circuit stated the federal RICO statute[6] was not designed to cover the typical landlord-tenant dispute involving the construction of a lease and determination of respective sums under the lease.  Likewise, this is a typical commercial dispute between Kennedy and Professional, involving construction of a loan commitment and determination of whether one party made an alleged oral assurance.

In light of the plain language of the loan commitment, Kennedy's repeated disclosure of the definition of "as is" market value, and the parties' course of dealing the record does not support Professional's contention that the definition of "as is" market value was so ambiguous so as to render the loan commitment "false" or "false or misleading."  Accordingly, Professional fails to identify a valid racketeering activity, necessitating dismissal of Professional's New Jersey RICO claim.  Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** with regards to Count Six.

---

[6]  The Supreme Court of New Jersey has explicitly stated that "federal legislative history and case law" relating to the federal RICO statute can be used for purposes of the New Jersey RICO statute, because "the federal statute served as an initial model." *State v. Ball*, 141 N.J. at 156.

C.     **Contract Claims**

Beyond Professional's New Jersey RICO claim and CFA claim, Professional

presents several other bases for relief.  In Count Two, Professional attempts to rescind the

contract by alleging that Kennedy and Gregg Wolfer engaged in unconscionable conduct.

(Second Amend. Compl. ¶¶ 68-71.)  Professional further maintains, in Count Three, that

Kennedy breached the terms of the loan commitment.  (*Id.* at ¶¶ 72-76.)

1.     *Unconscionability*

When evaluating unconscionability, courts looks at the relative levels of both

"procedural" and "substantive" unconscionability.  *Sitogum Holdings, Inc. v. Ropes*, 352

N.J. Super. 555, 564 (N.J. Ch. 2002).  "Procedural unconscionability" consists of

"unfairness in the formation of the contract" and includes a variety of inadequacies, such

as age, literacy, lack of sophistication, hidden or unduly complex contract terms,

bargaining tactics, and the particular setting existing during the contract formation

process.  *Id.*  "Substantive unconscionability" refers to "excessively disproportionate

terms," which suggest that "the exchange of obligations [was] so one-sided as to shock

the court's conscience."  *Id.* at 565.

In the instant matter, the record lacks evidence of either procedural or substantive

unconscionability.  After being introduced by a broker, the parties negotiated the terms of

the loan commitment, as evidenced by the April 12, 2004 letter from Wood to Gregg

Wolfer.  (Wolfer Aff. Ex. D.)  The parties operated with relatively equal bargaining

positions and experience and there is no evidence that Gregg Wolfer and Professional entered into a contract independent of the loan commitment.  Professional's claim of unconscionability will therefore be dismissed.  Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** with regards to Count Two.

2.      *Breach of Contract*

In addition to a claim for unconscionability, Professional maintains that Kennedy breached the terms of the loan commitment.  A party establishes a breach of contract by showing a valid contract, a breach of that contract by the offending party, and damages. *See, e.g.*, *Coyle v. Englander's*, 199 N.J. Super. 212, 223 (N.J. Super. Ct. App. Div. 1985).

Professional claims Kennedy breached the loan commitment by failing to use a "reasonably competent appraiser to appraise the property" and by refusing to use a mutually agreed upon appraiser for the third-party appraisal process.  (Second Amend. Compl. ¶¶ 73-74.)  The loan commitment sets forth the following appraisal process:

> The Borrower understands that [Kennedy] will inspect the Collateral and will, in its sole discretion, determine the as is market value.  Upon making a determination of value, [Kennedy] will deliver to Borrower a Loan Offer equal to Sixty Percent (60%) of the as is market value not to exceed the Financing Request.
>
> * * *
>
> If [Kennedy]'s determination of the value of the property is disputed by Borrower, Borrower may reject the Loan Offer and elect to engage the services of a third party appraiser.  If Borrower makes this election, the Borrower and [Kennedy] shall mutually agree on a third party MAI appraiser,

22

> with proper credentials, contracted by [Kennedy], and any fees for said appraiser to be reimbursed to [Kennedy] by Borrower prior to the appraisal being performed.

(Wolfer Aff. Ex. E.)

Upon execution of the loan commitment, Kennedy adhered to the procedure outlined in the agreement.  Kennedy retained Volpe for purposes of the initial appraisal.  (Wolfer Aff. Ex. F.)  Volpe appraised the property at $2,610,000, and assigned the collateral property an "as is" market value of $2,088,000.  (Lazare Affirmation Ex. OO tab 4.)  Relying on these values, Kennedy offered Professional a loan of $1,253,000, or approximately 60% of $2,088,000.  (Wolfer Aff. Ex. F.)  Dissatisfied with the appraised value, Professional requested a third-party appraisal and sent Kennedy a letter on April 27, 2004 attaching "a copy of an area phone book for you to use as reference for some companies to use in the local area."  (*Id.* at Ex. G.)  From this phone book, Kennedy selected Adamson & Associates at a cost of $2,000.  (*Id.* at Ex. I.)  Kennedy notified Professional in a May 13, 2004 letter that it had selected Adamson & Associates and requested reimbursement.  (*Id.*)  Thereafter, Professional paid Kennedy $2,000.

Although Professional did not explicitly suggest Adamson & Associates, there is nothing in the record to indicate that the parties did not "mutually agree" on this selection.  Professional affirmatively sent Kennedy a copy of the phone book with instructions "to use it as a reference for some companies in the local area."  (*Id.* at Ex. G.)  After selecting Adamson & Associates, Kennedy promptly notified Professional by letter.

(*Id.* at Ex. I.)  Professional did not object to this appraiser and, to the contrary, evidenced mutual acceptance by forwarding Adamson & Associates's $2,000 fee, as required under the loan commitment.  Following the selection of Adamson & Associates, the third party appraiser determined the collateral property had a market value of $3,040,000 and an "as is" market value of $2,430,000.  (*Id.* at Ex. K.)  Based on these values, Kennedy offered Professional financing of $1,458,000, or approximately 60% of $2,430,000.  Despite two extensions of time, Professional did not accept the offered financing.  (*Id.* at Exs. M-N.)

Lacking any evidence that Kennedy breached the underlying loan commitment or any evidence that either Volpe or Adamson & Associates were not "reasonably competent" appraisers, Professional's claim for breach of contract must be dismissed.  Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** as to Count Three.

**D.**   **Common Law Fraud and Unjust Enrichment**

In Counts Four and Five, Professional further asserts claims against Kennedy and Gregg Wolfer for common law fraud and unjust enrichment.  Based on this alleged wrongdoing, Professional seeks $54,000, as well as punitive damages.  (Second Amend. Compl. ¶¶ 77-88.)

1.      *Common Law Fraud*

To state a claim of common law fraud, a plaintiff must demonstrate: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or believe by the defendant of its falsity; (3) an intent by the other person to rely upon it; (4) reasonable reliance thereof by the other person; and (5) resulting damages.  *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (N.J. 1997).  Fed. R. Civ. P. 9(b) requires that claims of fraud be pled with particularity.  Professional maintains that Kennedy engaged in fraud by "deliberately misrepresent[ing] the meaning of the 'as is' market value" and by making an oral assurance, which deprived Professional of a non-refundable loan commitment fee.[7]  (Second Amend. Comp. ¶ 80.)

As an initial matter, two triable issue of fact exist as to whether Kennedy's alleged oral assurance rises to the level of common law fraud.  Professional presents evidence that Kennedy, via Gregg Wolfer, told Brenda Wood during an April 9, 2004 telephone conversation that if the property met the "appraised value" of between $3,100,000 and $3,200,000 "that there should be no problem getting this deal through."  (Lazare Affirmation Exs. II, OO tab 2.)  First, an issue of fact exists as to whether Gregg Wolfer made this assertion.  The only evidence supporting Professional's contention is the self-

---

[7] Professional also alleges that Kennedy engaged in fraud by "deliberately caus[ing] the evaluation of the real estate collateral to be substantially understated."  (Second Amend. Compl. ¶ 81.)  However, Professional presents no evidence related to this statement in its opposition papers. Without evidence to support this contention, Professional's claim for common law fraud cannot be supported on this basis.

serving deposition testimony of its CEO Brenda Wood.  Second, assuming that Gregg

Wolfer made this assertion, there is a question of fact as to what Wolfer meant by

"appraised value."  As stated in its supporting papers, Professional interpreted "appraised

value" to mean "appraised market value" and thus to indicate that the collateral property

would not be discounted by 20% for purposes of determining the loan offer, since

Kennedy knew that Professional believed the property to have a value of between

$3,000,000 and $3,200,000.  (Wolfer Aff. Ex. E; Lazare Affirmation Exs. II, OO tab 3.)

A second reasonable interpretation of this phrase exists, namely that "appraised value"

meant "as is" market value, as repeatedly disclosed in the loan commitment and

associated documents.  (Wolfer Aff. Exs. B-C, E.)  Depending on the resolution of this

material fact, Professional could have reasonably relied upon Gregg Wolfer's statement

when entering into the loan commitment, suffering a pecuniary loss in the form of the

non-refundable $54,000 loan commitment fee.

Even so, Professional cannot maintain a claim for fraud based on allegations that

Kennedy deliberately misrepresented the meaning of "as is" market value by failing to

disclose the exact percentage that the appraised value would be discounted to derive the

"as is" market value.  As described more fully above, the definition of "as is" market

value is not ambiguous.  The use of the phrases "cash buyer" and "three (3) to four (4)

month sale" indicates that Kennedy intended to discount the collateral's value for

purposes of determining the loan offer.  Moreover, the absence of an exact percentage of

discount does not render the definition ambiguous, because the parties agreed to rely on the independent determination of an appraiser to determine the "as is" market value. Implied in this agreement was the notion that the appraiser would use specialized knowledge to determine a value of the collateral based on a short marketing period to a cash buyer. There is nothing in the record to indicate that Kennedy held itself out to be an "appraiser" or that Kennedy colluded with either appraiser to lower the appraised value of the collateral property.

Professional attempts to avoid this conclusion by arguing that Kennedy was under a duty to disclose the amount the appraised value would be discounted. Professional points to evidence of one prior transaction involving Kennedy, where the same appraiser used here, Volpe, discounted the collateral's appraised value by 20% and 30% to derive the similarly termed "'as is' quick sale market value," defined as a 90-to-120 day sale to a cash buyer. (Lazare Affirmation Exs. X, Y & Z).

Under New Jersey law, silence in the face of a "duty to disclose" may constitute fraudulent concealment. *Strawn v. Canuso*, 140 N.J. 43, 56 (N.J. 1995). The question of whether a duty to disclose exists is a matter of law. *Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc.*, 135 N.J. 182, 194 (N.J. 1994). This determination is one of fairness and policy that "involves identifying, weighing, and balancing several factors–the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo*

*Realtors*, 132 N.J. 426, 439 (N.J. 1993).  Such a duty generally arises if: (1) a fiduciary relationship exists; (2) either party entering into the contract "expressly reposes" a trust and confidence in the other; or (3) the transaction is "intrinsically fiduciary" in nature. *Berman v. Gurwicz*, 189 N.J. Super. 89, 93-94 (N.J. Ch. 1981).

In the instant matter, Professional presents no evidence showing that Kennedy had a duty to disclose the percentage by which the appraised collateral would be discounted to calculate the "as is" market value.  The record lacks evidence that the parties operated under a fiduciary relationship or that Professional "expressly reposed" trust and confidence in Kennedy.  Moreover, the creditor-debtor relationship between Kennedy and Professional fails to qualify as an "intrinsically fiduciary" relationship.  *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 552 (N.J. Super. Ct. App. Div. 1997) (collecting cases and stating that creditor-debtor relationships rarely give rise to a fiduciary duty).

Evidence related to Professional's opportunity to exercise care also mitigates against finding a duty to disclose.  Being an experienced commercial entity, Professional had more than sufficient opportunity to inquire into the definition of "as is" market value. Professional received the definition of this phrase in three separate documents, including the final version of the loan commitment.  (Wolfer Aff. Exs. B-C, E.)  Although Professional attempted to negotiate the terms of the loan commitment and raised several unrelated issues in its April 12, 2004 letter, Professional never questioned the definition's meaning.  (*Id.* at Ex. D.)  Based on the plain language of the commitment and a lack of

evidence relating to Kennedy's duty to disclose, the Court concludes that no reasonable mind could disagree as to whether Kennedy misrepresented the meaning of "as is" market value.

Even though Professional can maintain a fraud claim against Kennedy, the claim against Gregg Wolfer must be dismissed.  Corporate officers may be held personally liable for torts under the "tort participation" theory if the action sounds in tort as opposed to contract.  *Saltiel*, 170 N.J. at 305, 314.  Much like the individual claim under the CFA, the loan commitment defined the scope of the parties obligation.  The expectation was that Kennedy would provide the needed financing and not Gregg Wolfer individually. Nothing in the record indicates that Gregg Wolfer owed an independent duty outside of this contractual relationship or that Wolfer committed any separate and independent fraud.

Likewise, Professional's claim for punitive damages must also be dismissed.  An award of punitive damages requires that a plaintiff prove, by clear and convincing evidence, that the harm suffered by the plaintiff was the result of the of the defendants' actions or omissions and that either: (1) the defendants' conduct was malicious; or (2) the defendants acted in wanton and willful disregard of another's rights.  N.J.S.A. § 2A:15-5.12(a).  Malicious conduct is "an intentional wrongdoing in the sense of an evil-minded act."  Willful or wanton disregard is "a deliberate act or omission with knowledge of a

high degree of probability of harm to another and reckless indifference to the consequences of such act or omission."  N.J.S.A. § 2A:15-5.10.

Professional fails to present any evidence, much less "clear and convincing" evidence, that Kennedy acted with malice or willful disregard when making the alleged oral assurance.  At most, Professional can assert that Wolfer acted with willful disregard based on his knowledge of prior Kennedy transactions where the lender discounted the appraised collateral values by 20% or more.  (Lazare Affirmation Exs. X, Y & Z). However, Professional does not present evidence linking Gregg Wolfer to any such transaction.  The only prior transaction in the record was executed on February 16, 2001 by Kennedy Vice President Mike Bahiri.  Volpe's subsequent appraisal was sent to Joseph Wolfer and Matt Cole, not Gregg Wolfer.  (*Id.*)  Failing to establishing that Gregg Wolfer knew that the collateral property would be discounted by a certain percentage or presenting any other related evidence, Professional's request for punitive damages claim must be dismissed.

For purposes of Count Four, Defendants' motion for summary judgment is **GRANTED** with regards to Gregg Wolfer and both parties' motions for summary judgment are **DENIED** with regards to Kennedy.

2.    *Unjust Enrichment*

Finally, in Count Five, Professional asserts a related claim for unjust enrichment based on the "substantial benefit" that Kennedy and Gregg Wolfer received from the

alleged misrepresentations.  (Second Amend. Compl. ¶¶ 85-88.)  A claim for unjust

enrichment requires a showing that "defendant received a benefit and that retention of

that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135

N.J. 539, 554 (N.J. 1994).  Where there is an express contract covering the identical

subject matter of the claim, a plaintiff cannot pursue a quasi-contractual claim for unjust

enrichment.  *St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*, Civ. No.

04-4540, 2005 WL 1199045, at *7 (D.N.J. May 18, 2005) (citing *Winslow v. Corp.*

*Express, Inc.*, 364 N.J. Super. 128, 143 (N.J. Super. Ct. App. Div. 2003)).  However, if

the written document is unenforceable, the plaintiff may maintain an unjust enrichment

claim.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 621-22

(D.N.J. 1996).  A contract induced by fraud may be deemed invalid and unenforceable

under the law.  *Nolan by Nolan v. Lee Ho*, 120 N.J. 465, 472 (N.J. 1990).

Since a question of fact exists as to Professional's fraud claim against Kennedy, it

would be premature to dismiss Professional's unjust enrichment claim against the lender.

Therefore, Defendants' motion for summary judgment is **GRANTED** with regards to

Gregg Wolfer and both parties' motion for summary judgement are **DENIED** with

regards to Kennedy.

**G.     Subject Mater Jurisdiction**

With only a viable claim against Kennedy in Counts Four and Five for common

law fraud and unjust enrichment, the Court must consider whether it still has subject

matter jurisdiction over the present action.  A district court must dismiss an action, at any stage of the litigation, whenever it appears to a "legal certainty" that subject matter jurisdiction is lacking.  *See Kontrick v. Ryan*, 540 U.S. 443 (2004) (holding that subject matter jurisdiction may be raised initially by either party, or *sua sponte* by the court, at any stage of litigation, including appeal).

For diversity matters, a court lacks subject matter jurisdiction if the amount-in-controversy falls below $75,000, excluding interest and costs.  28 U.S.C. § 1332(a).  The only remaining claims are Counts Four and Five against Kennedy for compensatory damages.  Under these claims, Professional only seeks damages of $54,000, equal to the amount of the non-refundable loan commitment fee.  This amount is well below the jurisdictional threshold, making it a "legal certainty" that this Court lacks jurisdiction.  The present action is thus *sua sponte* **DISMISSED**.[8]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED** with regards to Counts One, Two, Three, and Six.  Defendants' motion for summary judgment is **GRANTED** with regards to Gregg Wolfer and **DENIED** with regards to Kennedy for purposes of Counts Four and Five.  Professional's cross-motion for summary judgment is **DENIED** in its entirety.  In addition, the Court will *sua sponte*

---

[8] Since the Court lacks subject matter, it will not address Kennedy's request to enforce the limitation-of-liability clause and "waiver of trial by jury" clause found in the loan commitment.

**DISMISS** the present matter for lack of subject matter jurisdiction.  An appropriate

Order accompanies this Letter Opinion.


s/William J. Martini
**William J. Martini, U.S.D.J.**